IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-00296-MSK-MEH

THE WILDERNESS SOCIETY,
CENTER FOR NATIVE ECOSYSTEMS,
COLORADO ENVIRONMENTAL COALITION,
COLORADO MOUNTAIN CLUB, and
SIERRA CLUB,

        Plaintiffs,

v.

SALLY WISELY, State Director of the Bureau of Land Management,
UNITED STATES BUREAU OF LAND MANAGEMENT,
MITCH KING, Acting Regional Director of the U.S. Fish and Wildlife Service,
UNITED STATES FISH AND WILDLIFE SERVICE,

        Defendants.

---

## OPINION AND ORDER VACATING, IN PART, AGENCY ACTION

---

**THIS MATTER** comes before the Court pursuant to proposed Intervenor Williams

Production RMT Co.'s ("Williams") Renewed Motion to Intervene (**# 40**), the Plaintiffs'

response (**# 46**), and Williams' reply (**# 48**); the Plaintiffs' Unopposed Motion to Seal (**# 41**)

certain exhibits in support of the Plaintiffs' Motion to Supplement the Administrative Record; the

Plaintiffs' Motion to Supplement the Administrative Record (**# 43**, as supplemented **# 54**), the

Defendants' response (**# 47**), and the Plaintiffs' reply (**# 55**); the Plaintiffs' Unopposed Motion for

Leave to File the Administrative Record Conventionally (**# 59**); the Plaintiffs' Motion for Review

of Agency Action (**# 61**), the Defendants' response (**# 72**), Williams' response (**# 71**), and the

Plaintiffs' reply (**# 76**)[1]; and the Plaintiffs' Unopposed Motion for Leave to File an Overlength

Brief (**# 75**).

## FACTS

This action concerns a parcel of land approximately two miles west of DeBeque,

Colorado, known as the South Shale Ridge (sometimes "the Ridge").  The Ridge is an irregularly-

shaped parcel extending approximately 15 miles in a predominantly east-west orientation,

approximately seven miles wide at its largest bulge, and perhaps two miles wide at its narrowest.

All told, the South Shale Ridge encompasses more than 32,000 acres of land.  The entirety of the

Ridge is federal property, under the stewardship of the United States Bureau of Land

Management ("the BLM").

1.  History of the management approaches to the South Shale Ridge

In 1980, the BLM inventoried its lands to determine whether any areas should be

designated as Wilderness Study Areas ("WSAs") under Section 603 of the Federal Land Policy

Management Act ("FLPMA"), 43 U.S.C. § 1782.[2]  With regard to the South Shale Ridge, the

BLM found that it "retains its primeval character with only minor imprints of man" and had

"outstanding scenery," but nevertheless found the area unsuitable for potential wilderness

---

[1]Both sides subsequently filed Notices of Supplemental Authority (**# 79, 80**).

[2]FLPMA included a Congressional directive that the BLM undertake a 15-year project to review its land holdings for wilderness characteristics, and recommend appropriate parcels to the President for designation as federally-protected wilderness areas.  43 U.S.C. § 1782(a).  Pending the President's evaluation, lands that the BLM proposed as candidates for wilderness designation were labeled as WSAs.  To preserve their wilderness character during the deliberative process, WSAs were strictly required to be conserved "so as not to impair the suitability of such areas for preservation as wilderness."  43 U.S.C. § 1782(c).

designation due to its lack of opportunities for solitude and recreation, owing to the lack of sight-obscuring vegetation and confining topography.  BLM 113.[3]

In the mid-1980s, the BLM drafted a comprehensive Resource Management Plan (sometimes "the Plan" or "the 1987 Plan") for the geographic region encompassing the South Shale Ridge.  The Plan was intended to identify the major resources and characteristics of the area, and to identify the particular management priorities (*e.g.* recreation, mining, wildlife management, etc.) that the BLM would emphasize for each piece of land within the region.  Although the Plan noted the need for various conservation efforts to protect the natural setting and the scenic and geologic features of the South Shale Ridge, it ultimately concluded that the BLM's primary management emphasis for the Ridge should be on leasing the land for energy development (*e.g.* oil, gas, and coal) .  BLM 746-47.  As a result, by 1992, the BLM had leased the entire South Shale Ridge for oil and gas development.  As of 2005, 30 leases remained active, encompassing 11,000 acres of the parcel.[4]  BLM 1244.

In 1994, several groups, including some of the Plaintiffs here, presented a comprehensive proposal to the BLM, suggesting, among other things, that the entire South Shale Ridge be designated as a WSA.   In 1997, the BLM undertook a review of the proposal, sometimes

_____

[3]The parties submitted three sets of documents comprising the Administrative record. Citations to "BLM ___" refer to contents of the 8 volume BLM record; "FWS ___" refer to the 3 volume Fish and Wildlife Service ("FWS") record; and "SUP ___" refer to the parties' 2 volume supplemental record.

[4]Although the entirety of the Ridge was apparently subject to leases at one time or another, it is undisputed that much of the land presently remains in an undisturbed state.  The Court assumes that many of the leased areas were never actually exploited by the lessees.

3

referred to in the record as a "wilderness inventory." The results of that study, released in 2001,[5] concluded that the majority of the area, approximately 27,631 acres, retained its natural character; that four areas within the parcel, amounting to approximately 4,800 acres, were "unnatural in appearance due to the presence of gas wells and their associated structures"; that the bulk of the area offered outstanding opportunities for seeking solitude or recreation; and that it contained important ecological features, including the presence of several species of plants recognized as threatened or sensitive.[6]  BLM 953-55.  Based on the 2001 findings, the BLM contemplated revisiting the 1987 Resource Management Plan to consider whether the Plan should be amended to change the management priorities for the South Shale Ridge from energy development to conservation.  While it considered whether such a change was necessary and appropriate, the BLM suspended all new leasing activities in the Ridge.  BLM 855.

Meanwhile, in 1996, the State of Utah sued the BLM, seeking to stop the BLM's consideration of whether to designate lands in that state as WSAs.  The crux of the Utah lawsuit was an allegation that the BLM's statutory authority to designate WSAs had expired in 1993, at the conclusion of FLPMA's 15-year wilderness-designation program.  *See generally Utah v. Norton*, 2006 WL 2711798 at * 1, 4  (D. Utah 2006) (slip copy).  In 2003, the BLM and Utah entered into a settlement of the dispute ("the Utah Settlement"), in which the BLM agreed that its authority to conduct wilderness reviews had expired in 1993, and that thereafter, it lacked the

---

[5]The parties sometimes refer to this study as the "1999 inventory," even though the results were not released until 2001.  For purposes of this opinion, the Court will refer to it as occurring in 2001.

[6]Of particular relevance to this action are the presence of the Unita Basin hookless cactus (*Sclerocactus glaucus*); the DeBeque phacelia (*Phacelia submutica*); and the DeBeque milkvetch (*Astragalus debequaeus*).

authority to designate new WSAs.  *Id.*  In September 2003, the BLM issued directives to its field offices implementing the terms of the Utah Settlement.  Specifically, the BLM advised the field offices that although they could no longer designate lands as WSAs and impose the strict non-impairment standard that accompanies such a designation, the BLM could continue to inventory lands for wilderness characteristics and employ other elements of the land-use planning process to "manage them using special protections to protect wilderness characteristics."   BLM 971-73.

### 2. The current dispute

In 2004, energy companies requested that the BLM reopen oil and gas leasing in the Ridge.  In response to those requests, the BLM observed that the 1987 Plan emphasizing energy development priorities had never been reconciled with the 2001 findings that the South Shale Ridge had significant wilderness characteristics.  The BLM embarked upon a decisionmaking process to address "the extent to which this information, especially the [2001 wilderness inventory], presents potential environmental consequences from oil and gas leasing that were not analyzed in the [1987 Plan]."  BLM 1241.  Specifically, the BLM sought to determine "whether the new information is sufficient to show that oil and gas leasing in South Shale Ridge will affect the quality of the natural and human environment in a significant manner or to a significant extent not already considered in the [1987 Plan]."  *Id.*

In July 2004, the BLM issued a draft Environmental Assessment ("EA"), addressing two alternatives: (i) the "proposed action," namely, "to make the South Shale Ridge area available for oil and gas leasing"; and (ii) an alternative permitting the leasing of lands to resume, but subjecting all such new leases to a "no surface occupancy" restriction (*i.e.* requiring that access to

stores of oil and gas under the Ridge be obtained only by means of angled drilling from wells located outside the Ridge's boundaries).[7]  BLM 1051-1080.

The BLM circulated the July 2004 draft EA and reviewed a number of internal and external comments on it.  In April 2005, the BLM issued a revised draft EA.  BLM 1155-1196. Like the July 2004 draft EA, the April 2005 draft also addressed two alternatives, but replaced the "no surface occupancy" alternative with a straightforward "no action" alternative that the BLM had declined to consider in July 2004.  BLM 1158.  As a result, the April 2005 EA did not expressly purport to consider the effects of permitting drilling subject to "no surface occupancy" restrictions.

On September 26, 2005, after another round of public comment, the BLM issued the final version of its EA.  BLM 1241-1282.   Like the April 2005 draft, the final EA addressed two alternatives: (i) making the South Shale Ridge available for oil and gas leasing; or (ii) the "no action" alternative of continuing the current policy deferring any new oil and gas leases. Accompanying the final EA was the BLM's Finding of No Significant Impact ("FONSI").  BLM 1276-1280.  Specifically, the BLM found that "Some minor and short-term impacts to air, water, [and] soil can be expected" from resuming oil and gas leasing, but that "these impacts would be localized and insignificant."  BLM 1276.  The BLM also found that "Long-term, minor impacts to wildlife, air quality, visual resources and noise are also possible," but that "stipulations and mitigation measures placed as Conditions of Approval will serve to insure these impacts are

---

[7]The July 2004 EA expressly acknowledged the BLM's consideration of a third, "no action" alternative of continuing to restrict all new leasing.  Noting that the "no action" alternative would have the same environmental impacts as the "no surface occupancy" alternative without offering the benefits of that alternative, the BLM declined to consider the "no action" alternative further.  BLM 1052.

minimized to the greatest extent possible." *Id.* Thus, the BLM concluded that oil and gas leases in the Ridge could "be offered for sale." BLM 1276.

On the day it issued the final EA and FONSI, the BLM also issued a Notice of Competitive Lease Sale. BLM 1739. The Notice advised interested parties that energy development leases would be offered on 78 parcels around Colorado, including 16 within the boundaries of the South Shale Ridge. The Notice advised potential bidders of particular protective stipulations and restrictions that would attach to certain leases. The lease sale was conducted as scheduled on November 10, 2005, and all of the parcels in the South Shale Ridge were leased. BLM 1881.

3. Issues presented here

The Plaintiffs assert five alleged errors in their Amended Complaint (# 4): (i) that the BLM violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), in that it did not adequately consult in advance with the U.S. Fish and Wildlife Service ("the FWS") regarding the effects that the BLM's September 2005 decision to resume leasing would have on an ESA-covered species, the hookless cactus; (ii) that the decision by the BLM and FWS to informally, rather than formally, consult regarding the hookless cactus violated the ESA; (iii) that the FWS violated the ESA by failing to "emergency list" the DeBeque phacelia as a threatened species in under 16 U.S.C. § 1533(b)(3)(C)(iii); (iv) that the BLM violated the National Environmental Policy Act ("NEPA"), because its September 2005 EA and FONSI were defective in various ways, and thus, the September 2005 decision to permit oil and gas leasing and its November 2005 decision to grant the leases, in reliance upon that allegedly defective EA and FONSI, were arbitrary and capricious; and (v) that the BLM violated FLPMA, in that its September 2005 and

November 2005 decisions are contrary to the existing Resource Management Plan in place for the area and because such decisions will cause unnecessary degradation of the wilderness characteristics in the South Shale Ridge.

The parties submitted the administrative records for proceedings before both the BLM and the FWS, and the Plaintiffs have further sought to enlarge that record with additional and supplemental documents as discussed more fully herein.  Both sides have filed substantive briefs addressing the merits of each of the Plaintiffs' claims in light of the administrative record and governing law.  In addition, Williams, a lessee on some of the parcels at issue, moved to intervene in this action to protect its interest in its leases, and filed a substantive brief on the issues presented.  All parties, including Williams, participated in oral argument before the Court on June 28, 2007.  In addition to the substantive issues raised by the Amended Complaint, there are also several non-substantive motions pending before the Court, discussed more fully herein.

## ANALYSIS

At the outset, it is important for the Court to emphasize several matters that it is _not_ deciding in this action.  First, and perhaps most importantly, it is not deciding whether energy development or environmental conservation should enjoy superior priority in land-management decisions.  Both management philosophies have their own relative advantages and disadvantages, and their own supporters and detractors.  Thankfully, it is not the role of the Court to assess these competing philosophies, or to set policy priorities; that task is Congressionally and Constitutionally designated to the BLM.  The Court's role is much narrower.  The Court's focus is upon the _process_  by which the BLM made its decisions.  So long as the BLM engaged in the proper procedural steps in making its decision, and so long as that decision draws its essence from

8

substantial evidence in the administrative record, the <u>wisdom</u> of its actual decision is beyond the scope of the Court's review.

Similarly, to the extent that the Court finds that certain decisions by an agency were arbitrary and capricious, the Court emphasizes that this is a determination only as to the sufficiency or correctness of the process that was used, not a finding that the decision was unwise or reflected ill-advised policy choices. Once again, the Court is neither called upon nor inclined to make such assessments. Moreover, the Court ascribes no improper motives to the actions of any party here.   In cases such as these, where motive or intent is not at issue, the Court has the luxury of assuming that all parties have played their roles in the decisionmaking and review process with nothing but the best of intentions, and the Court's findings reflect only a neutral, technical assessment of the actual means by which the BLM reached its decision.

**A. Preliminary issues**

1. <u>Williams' Motion to Intervene</u>

Fed. R. Civ. P. 24(a) requires the Court to allow intervention where the intervenor both: (i) has an interest at issue in the action that may be impaired by the outcome, and (ii) has interests that are not adequately represented by existing parties. Where a party is not entitled to intervention as of right under Rule 24(a), permissive intervention under Rule 24(b) is still possible. To be entitled to permissive intervention, Williams must demonstrate that it has a claim or defense that shares a common issue of law or fact with the issues arising between the Plaintiffs and Defendants, and that permitting such intervention will not unduly delay or prejudice the rights of the original parties.  The Plaintiffs contend that Williams is not entitled to intervene under either theory.

Although the Court has some doubt as to whether Williams has interests that diverge

sufficiently from those of the Defendants such that mandatory intervention under Rule 24(a) is

appropriate, it need not definitively resolve that issue because it nevertheless finds it appropriate

to extend permissive intervention to Williams under Rule 24(b).  Regardless of how they may be

conceived and described, Williams possesses interests in leases it has obtained as a result of the

November 2005 lease sale, and matters relating to the legality of the decision reached by the BLM

that resulted in the sale of those leases clearly share common questions of law and fact with the

Plaintiffs' claims.  Moreover, allowing Williams to intervene will not unduly affect the rights of

the Plaintiffs and Defendants, as all sides have had a full opportunity to review and respond to

Williams' arguments.  Accordingly, Williams' Motion to Intervene pursuant to Fed. R. Civ. P.

24(b) is granted, and the Court has considered Williams' brief on the merits of the claims.

## 2. Motion to Supplement Record

The Plaintiffs request that the Court receive additional documents as either supplements to

the administrative record, or as extra-record evidence.  The Court confesses some degree of

difficulty in understanding the precise requests and the parties' positions as to those requests, as a

result of a lack of clarity in the initial briefing and the shifting positions.  As best the Court can

determine, the Defendants do not oppose supplementing the record to include two items of

correspondence from and to Suzanne Jones at Plaintiff Wilderness Society, and certain documents

relating to errors in a 1996 lease sale.[8]  The Court grants the motion to supplement with regard to

_____

[8]The Defendants also do not oppose supplementing the record with two additional
documents from 1994 and 1998, but state that no copies of those documents can be located.
There is little value in directing that the record be supplemented by documents that cannot be
found, and thus, the Plaintiffs' motion to supplement is denied as moot as it relates to these
documents.

these documents, deems the record to be supplemented by these documents, and has considered the documents as they relate to the substantive issues in this case.

The Defendants oppose the Plaintiffs' request to supplement the record with certain documents that were before the agencies, but were not relied upon as part of the decisionmaking process. These documents are notices and letters from 2004 and 2005 relating to the DeBeque milkvetch. As the Plaintiffs note, the record properly consists of all relevant documents before the agency at the time of the decision, not simply those that the agency relied upon in reaching its decision. Accordingly, the Court grants the motion to supplement with respect to these documents, deems the administrative record to be supplemented by these documents, and has considered them with regard to the substantive issues in the case.

Finally, the Plaintiffs request that record be supplemented to include two additional types of documents. First, the Plaintiffs request supplementation with copies of maps that were part of the Resource Management Plan, but not included in the record. The Defendants respond that the maps in question are available as part of the compact discs containing electronic copies of the administrative record. Accordingly, the Court denies, as moot, the Plaintiffs' motion to supplement the record to include the maps. The Plaintiffs also seek to supplement the record with copies of more than 8,000 comments received by the BLM in response to the 2005 EA. The BLM responds that the excluded comments were identical copies of form e-mails received from the commentators, and that they provided a representative sample of these comments to the 2005 EA as part of the record. The Court denies the Plaintiffs' motion on this issue. Although the Court can appreciate the Plaintiffs' desire for a complete record, requiring the Defendants to collect and reproduce thousands of otherwise identical e-mails is extremely burdensome and

serves no practical purpose.  The Defendants state that they have offered to make all of the e-mails available to the Plaintiffs for inspection to guard against any charges that the Defendants may be selectively concealing relevant materials, and despite that offer, the Plaintiffs do not dispute the Defendants' contention that the excluded materials are effectively identical to material already within the record.

Finally, the Court denies the Plaintiffs' request that it consider certain extra-record evidence.  Without addressing each proposed item separately, the Court merely notes that the proffered documents are either irrelevant to the issues before the Court, or are needlessly cumulative of information already within the record.

3. <u>Motion to Seal</u>

The Plaintiffs request that the Court seal three maps tendered by the Plaintiff as extra-record evidence.  The maps indicate the locations where the three sensitive plant species can be found, inside and outside the South Shale Ridge.  The Plaintiffs explain that plants are known targets of illegal harvesting by collectors of rare specimens, and that publicizing the precise locations of these plants within the Ridge would further endanger these already vulnerable species.

As discussed above, the Court has declined to consider the extra-record evidence, including the three maps.  Because the Court has not considered the maps in reaching its decisions in this case, there is no public interest to be served by providing access to them.[9]  *See United*

---

[9]To the extent that one might argue that the public requires access to the maps to determine if the Court is correct in concluding that the maps are irrelevant or redundant, the Court notes that the Plaintiffs themselves acknowledge that there are maps already in the record that might adequately substitute for the maps tendered by the Plaintiffs.  *See e.g.* SUP 421.  The Court also notes that the <u>precise</u> location of the various plant species within the boundaries of the

*States v. McVeigh*, 119 F.3d 806, 814 (10th Cir. 1997).  Accordingly, the motion to seal is

denied, but because there is no public interest in reviewing documents that the Court has not

considered, the Court will not direct the unsealing of the documents.

    4.  Other motions

The Plaintiffs' Unopposed Motion for Leave to File the Administrative Record

Conventionally is granted.  The Plaintiffs' Unopposed Motion for Leave to File an Overlength

Brief is granted.

**B.  Standard of Review**

The Plaintiffs' substantive claims are subject to the Administrative Procedures Act

("APA") found at 5 U.S.C. § 701, et seq.  Under 5 U.S.C. § 702:

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the
> meaning of a relevant statute, is entitled to judicial review    thereof.
> . . .

In turn, judicial review is governed by 5 U.S.C. § 706, which provides that a court reviewing an

agency's action shall:

> (1) compel agency action unlawfully withheld or unreasonably
> delayed; and
> (2) hold unlawful and set aside agency action, findings, and
> conclusions found to be--
> > (A) arbitrary, capricious, an abuse of discretion, or
> > otherwise not in accordance with law; . . .
> > (D) without observance of procedure required by law; . . .

---

South Shale Ridge is not critical to the disposition of the claims here; rather, the critical fact that
all three types of plants are located within some or all of the leased area is undisputed by the
parties.  Thus, a map showing the precise locations of the plants is of little relevance to the issues
to be decided.

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

This Court may affirm an agency's decision only "on the grounds articulated by the agency itself." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1565, 1575 (10th Cir. 1994). "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency[.]" *Id.* at 1575.

Although the "agency's decision is entitled to a presumption of regularity," it is not shielded from a probing review. *Id.* at 1574. When the challenge is that the agency's decision is arbitrary and capricious, the Court must determine whether the agency examined the relevant data and factors, and whether it articulated a rational connection between the facts and its decision. *Id.* As the Supreme Court instructs in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983):

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

The focus is upon the rationality of the decision making process, not upon the decision itself. *Olenhouse,* 42 F.3d at 1575.

The Court must determine whether there was a clear error in the Agency's judgment. *Id.* at 1574; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *overruled on other grounds*, *Califano v. Sanders,* 430 U.S. 99, 105 (1977). In doing so, the Court does not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.,* 401 U.S.

14

at 416; *Colorado Wild,* 435 F.3d at 1213.  It is not the Court's role to weigh conflicting evidence

or evaluate credibility.  *See Pennaco Energy, Inc. v. United States Dept. of Interior,* 377 F.3d

1147, 1159 (10th Cir. 2004).  Indeed, even when the administrative record contains evidence

which arguably conflicts with the agency's findings, it does not necessarily render the agency's

decision arbitrary and capricious.  *See id.*  Nor is it the Court's function to decide the propriety of

competing methodologies.  *See Silverton Snowmobile Club v. United States Forest Service,* 433

F.3d 772, 782 (10th Cir. 2006).

   Review of an agency's decision is usually deferential.  *See Citizens' Committee to Save

Our Canyons,* 297 F.3d at 1021.  The deference given "is especially strong where the challenged

decisions involve technical or scientific matters within the agency's area of expertise."  *Utah

Environmental Congress,* 443 F.3d at 739.  If the agency's exercise of discretion is truly

informed, then the Court defers to it.  *Utah Shared Access Alliance v. United States Forest

Service,* 288 F.3d 1205, 1213 (10th Cir. 2002).  However, if the record shows that the agency

prejudged the issues, then deference to the agency's decision is diminished.  *See Davis,* 302 F.3d

at 1112.

   The arbitrary and capricious analysis also requires the Court to conduct a plenary review

of the administrative record to see whether there are facts which support the agency's decision.

*Olenhouse,* 42 F.3d at 1575-76.  "Evidence is substantial in the APA sense if it is 'enough to

justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is

one of fact.'"  *Id.* at 1575.  To be substantial, evidence must be more than a scintilla; "it must be

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Id.* at 1581.  If evidence is overwhelmed by other evidence, or if it is simply a conclusion, then it is not substantial.  *Id.*

### C.  Endangered Species Act claims

#### 1.  Statutory background

The ESA  implements a Congressional policy that "all Federal Departments and agencies shall seek to conserve endangered species and threatened species."  16 U.S.C. § 1531(c)(1).  An "endangered species" is species of plant or animal that is "in danger of extinction throughout all or a significant portion of its range," while a "threatened species" is one which is likely to become endangered within the foreseeable future.  16 U.S.C. § 1532(6), (20).  The operative core of the ESA is a list maintained by the Secretary of the Interior of threatened and endangered species, and the ESA permits citizens to petition the Secretary to add species to (or remove species from) that list. 16 U.S.C. § 1533(b)(3)(A).  If presented with a sufficient petition, the Secretary has 12 months to consider the request and find that either: (i) the petitioned action is not warranted; (ii) the petitioned action is warranted (and thereafter, to issue appropriate regulations concerning that species); or (iii) that the petitioned action is warranted but that higher regulatory priorities preclude the Secretary from immediately promulgating protective regulations (*i.e.* that protective actions are "warranted but precluded" by more pressing threats to other species).  16 U.S.C. § 1533(b)(3)(B).

Once a species is listed as endangered or threatened (and, in some instances, where a petition seeking such a listing is pending), federal agencies are required to consult with the FWS on any agency action which may be likely to jeopardize the continued existence of the species or its habitat.  16 U.S.C. § 1536(a), 50 C.F.R. § 402.01(b).  Although the regulations contemplate

several different means of conferring, *see e.g.* 50 C.F.R. § 402.10, 402.11, the issues in this case focus on informal consultations under 50 C.F.R. § 402.13, and formal consultations under §402.14.  Informal consultation consist of "discussions, correspondence, etc." between the consulting agency and the FWS.  Informal consultation is designed to assist the agency in determining whether the contemplated action is likely to adversely affect a listed species.  50 C.F.R. § 402.13(a).  If both agencies agree that no adverse effects are likely, "the consultation process is terminated, and no further action is necessary."  *Id.*  If, on the other hand, either agency believes that adverse effects are possible, the agencies are obligated to undertake the formal consultation described in 50 C.F.R. § 402.14.

The Plaintiffs raise two ESA claims regarding the hookless cactus, an ESA-listed "threatened" species.  In their first claim, the Plaintiffs contend that the BLM did not adequately consult with the FWS under 16 U.S.C. §1536(a)(2) in advance of its decision to resume leasing on lands where the hookless cactus or its habitat is found.  In the second claim, the Plaintiffs contend that both the BLM and FWS violated the ESA in finding, after informal consultation, that awarding the leases was not likely to affect the hookless cactus.  In addition, the Plaintiffs raise a third claim under the ESA, alleging that the FWS had an obligation to "emergency list" the DeBeque phacelia, because the proposed leasing threatened the plant's habitat.

2. <u>Duty to confer on September 2005 EA and FONSI</u>

The Plaintiffs' first claim contends that the BLM did not adequately consult with the FWS under 16 U.S.C. § 1536(a)(2) with regard to the September 2005 decision to resume leasing on the South Shale Ridge.

On November 9, 2005 – after the September 2005 decision to resume leasing but before the November 10, 2005 lease sale and the November 17, 2005 announcements of the results of that sale – the BLM initiated informal conferral with the FWS by memo, stating that the BLM was intending to conduct a lease sale of various parcels, 9 of which included specimens of the hookless cactus or its habitat.  FWS 105-06.  The memo recited the characteristics of the hookless cactus' habitat, explained that leases for the parcels at issue would include stipulations that would advise the lessees that the parcels contained protected species and that various restrictions might be imposed on the use of those lands; and stated that "additional analysis may be conducted at the [Application for Permit to Drill] stage."  *Id.*  The memo concluded with the BLM's determination that "the sale of the oil and gas lease parcels . . . 'may affect but is not likely to adversely affect' this species."  *Id.* at 106.  The BLM then requested the FWS' concurrence with this conclusion.  On November 10, 2005, the FWS responded by memo, stating that "[it] concurs with the determination" that the sale of the parcels may affect the hookless cactus, but that it was not likely to adversely affect the species.  FWS 110-111.

The Plaintiffs allege both that this conferral was tardy, *i.e.* that the BLM should have consulted with the FWS prior to the September 2005 decision to resume leasing, and that the conclusions reached by the agencies that no adverse effect was likely were inconsistent with the record or otherwise improper.  The Defendants argue that the Plaintiffs fail to state a claim

because the September 2005 decision does not constitute a "final agency action" subject to challenge. Rather, the Defendants contend that the September 2005 "decision" was simply the completion of a "supplemental environmental analysis" occasioned by the 2001 findings. They state that the decision to open the South Shale Ridge to oil and gas development actually occurred in the 1987 Resource Management Plan, and the September 2005 "decision" was merely the continuance of the 1987 *status quo*.

The regulations interpreting the ESA define an "action" as "all activities or programs or any kind . . . carried out, in whole or in part, by Federal agencies. . .  Examples include, but are not limited to . . . (b) the promulgation of regulations; [and] (c) the granting of licenses, contracts, leases, [etc.]." 50 C.F.R. § 402.02. A "final agency action" occurs when two conditions are satisfied: (i) the action in question must mark the "consummation" of the agency's decisionmaking process – that is, it is neither tentative nor interlocutory in nature; and (ii) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Plaintiffs bear the burden of showing that the challenged action is final.  *Colorado Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).

The Defendants do not dispute that the September 2005 EA and FONSI represent the culmination of a decisiomaking process, or that the EA and FONSI are final in nature, and thus, the Court finds this element satisfied. In addition, it is clear that the EA and FONSI are actions that have legal consequences. Among other things, the BLM's decision to issue a FONSI terminates its obligation under NEPA to proceed to conduct an Environmental Impact Statement ("EIS"). *See* 40 C.F.R. § 1508.13; *accord Bennett*, 520 U.S. at 178 (agency's preparation of a

Biological Opinion was "final agency action" because it authorized agency to take certain actions).  In addition, the EA and FONSI allowed the BLM to offer parcels on the South Shale Ridge for leasing, and triggered the obligation of aggrieved individuals to protest the decision to include certain lands within that sale.  BLM 1743, *citing* 43 C.F.R. § 3120.1-3.  Thus, it is clear that the September 2005 EA and FONSI constitute "final agency action" for purposes of the ESA and APA.

The Defendants argue that in 2005, "BLM merely conducted supplemental environmental analysis" regarding whether the 1987 Resource Management Plan should be modified.  The Defendants characterize the FONSI as "BLM conclud[ing] that it would retain the *status quo*."  The BLM does concede, however, that the November 2005 award of leases constitutes an agency action for which ESA conferral was necessary.  Williams makes a similar argument, alleging that the September 2005 EA and FONSI are inextricably entwined with the November 2005 decision awarding leases to the highest bidders, and that the November 2005 decision is the final agency action that created the duty to confer under the ESA.

As to the Defendants' argument that the September 2005 EA and FONSI were simply decisions to maintain the *status quo*, the record is to the contrary.  The September 2005 EA itself states that "the current management" approach to the South Shale Ridge is "not leasing parcels," and that the "proposed action" is to "make the South Shale Ridge area available for oil and gas exploration through lease sales to the public."  BLM 1244.  The FONSI states that the BLM's "decision" is to "recommend that oil and gas leases in South Shale Ridge be offered for sale."[10]

---

[10]Although Catherine Robertson, Director of the BLM's Grand Junction office, used the word "recommend" in the decision section of the FONSI, it is not clear who that "recommendation" is made to.  There is no evidence in the record that some other individual

BLM 1276.  It is plainly evident that as of 2005, the *status quo* was that all proposals for additional leasing in the South Shale Ridge were being deferred, and that the September 2005 EA and FONSI reflect a decision to depart from that policy.

Williams' argument is more complex.  Williams points out that the 10th Circuit views leasing decisions as a three-stage process: the development of a Resource Management Plan; the determination as to whether a proposed lease is consistent with the Plan; and a review of the lessee's Application for Permit to Drill ("APD").  *Citing Pennaco*, 377 F.3d at 1151-52. Williams' argues that the September 2005 EA and FONSI and the award of the leases in November 2005 are indivisible components of the second phase, and that the BLM's "decision" – which triggered a duty to consult under the ESA – was the November 17, 2005 award of the leases.

The Court has carefully reviewed the cases relied upon by the parties and conducted its own independent research, and has been unable to locate any authority that directly addresses whether, in the circumstances presented here, the duty to consult under the ESA arose as a result of the September 2005 decision to resume leasing, or arose only at the time of the actual award of leases in November 2005.  Williams cites to *Pennaco*; *Wyoming Outdoor Council v. Bosworth*, 284 F.Supp.2d 81, 86 (D. D.C. 2003); *Park County Resource Council, Inc. v. U.S. Dept. of Agriculture*, 817 F.2d 609, 622 (10th Cir. 1987), *overruled on other grounds by Village of Los*

---

considered and adopted Robertson's "recommendation," and indeed, it is undisputed that the BLM's public announcement that parcels in the South Shale Ridge were being offered for leasing was issued on September 29, 2005, the same day that Robertson issued the FONSI.  *See* BLM 1297 ("The oil and gas leases up for sale . . . will go public September 26, 2005.  My understanding is that we release the final EA and signed Decision Record and FONSI the same day.")

*Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992); and *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999), but the Court finds all of these cases inapposite.[11]

*Pennaco*, *Park County*, and *Dombeck* all involve disputes arising under NEPA, not the ESA, and thus, are of no assistance in resolving when the duty to confer arises during the leasing process. (Even if one could analogize the duty to confer under the ESA with some duty arising under NEPA, none of the three cases addresses a factually analogous situation.) Only *Wyoming Outdoor Council* specifically addresses the ESA. There, the court considered whether the BLM had adequately discharged its obligations under the ESA to consult with the FWS before issuing certain oil and gas leases. 284 F.Supp.2d at 82. The BLM concluded in 1992 that oil and gas leasing in the area should be permitted notwithstanding its impacts on grizzly bear habitat, and had done so after engaging in formal consultation with the FWS under the ESA. *Id.* at 85. In 1997 and 1998, the BLM implemented that decision by issuing leases, and the plaintiffs sued, alleging that the BLM violated the ESA by not consulting with the FWS again prior to issuing the leases. *Id.* at 86-87. The court dismissed the plaintiffs' claims as unripe, observing that at the stage of lease issuance, the question of whether any development – much less development that could adversely affect grizzly bear habitat – would actually occur on the leased parcels remained unknown. *Id.* at 91-92. *Wyoming Outdoor Council* is of no assistance to this Court, as it is clearly factually inapposite. There, the BLM had already discharged its duties under the ESA by engaging in formal consultation before making its 1992 decision to open up the land for leasing.

_____

[11]The Defendants' brief did not address this issue, and the Plaintiffs' reply brief cites no cases addressing when the duty to confer under the ESA arises in circumstances such as these.

The Court draws some guidance from the ESA's regulations regarding the conferral process. Of particular note is 50 C.F.R. § 402.14(a), which directs that "[e]ach federal agency shall review its actions at the earliest possible time" to determine whether an action may affect protected species, and, if so, to engage in the appropriate level of conferral. This, in turn, suggests that the conference should occur as early as all of the necessary information is available; there is little logic in requiring an agency to make an early determination that conferral is required, only to allow the agency to postpone actually conferring until some indeterminate later date. Thus, the Court finds that the BLM's duty to confer with the FWS arises as of the time that it was possible for the two agencies to engage in meaningful conference regarding the decision to be made.

Nothing in the record suggests that it would have been impossible or unreasonable for the BLM to assess the potential impact of leasing on the hookless cactus in September 2005, rather than November 2005. Indeed, in the September 2005 EA, the BLM had already attempted to assess the effects that leasing would have on the hookless cactus, estimating the number of wells that would be constructed and the amount of land the wells and associated structures would occupy. BLM 1244. It had anticipated that development might intrude upon protected plant species, expressly noted that stipulations would be imposed upon leases to protect such species, and acknowledged that additional environmental assessments would be made in response to each separate APD. BLM 1251. In all material respects, the BLM's November 9, 2005 consultation memo to the FWS contains information that was available, in form if not substance, in the September 2005 EA. Thus, it appears that the BLM was capable of engaging in its ESA consultation prior to making the September 2005 decision to resume leasing.

In contrast, the Court finds nothing in the record that suggests that the BLM gained new information between September 2005 and November 9, 2005 that suddenly gave it the ability to engage in meaningful consultation with the FWS.  Indeed, the only information in the November 9, 2005 memo that is not found in the September 2005 EA is the specific language of the stipulations that would be applied to the leases.  But the record reflects that such language was included in the Notice of Sale, issued the same day as the EA and FONSI.  Thus, the BLM was aware of the text of the stipulations as of the date it made its decision.

Accordingly, the Court finds that the "earliest possible time" within which the BLM could have determined its need to consult with the FWS occurred prior to the September 2005 decision to resume leasing.  Thus, the Court finds that the actual duty to confer arose at that time, as well. Because the BLM did not confer with the FWS prior to the September 2005 decision, the Court finds that the BLM violated the ESA.  However, it is apparent that any such violation was harmless in light of the informal consultation that occurred between the agencies two months later.  As the Court has found, the record reveals that no new substantive information bearing on the issues arose between September and November 2005, and thus, there is no reason to believe that a conference in September 2005 would have yielded different results than the actual conferral in November 2005.  Requiring the BLM and FWS to confer again would not serve any meaningful purpose.

### 3. Sufficiency of conference in November 2005

The Plaintiffs' second claim asserts that the informal consultation between the BLM and FWS in November 2005 was insufficient to comply with the ESA.  The Plaintiffs argue that: (i) informal consultation was not permitted under the terms of the 1987 Plan; (ii) the BLM did not prepare a biological assessment ("BA") as required by 16 U.S.C. § 1536(c)(1) before conferring; (iii) the finding that adverse effects on the cactus were unlikely was inconsistent with the evidence in the record; and (iv) the BLM improperly relied upon prospective and vague lease stipulations to protect the cactus.

### a. Formal consultation required by the 1987 Plan

Turning to the first argument, the Plaintiffs contend that the 1987 Plan called for formal, rather than informal, ESA conferral any time the BLM determined that a proposed activity "may affect" a protected species.  The relevant text is not within the body of the Plan itself, but in an errata table showing various corrections and amendments to the Plan's text.  BLM 650.  It states "Environmental assessments will be prepared on specific projects following the general land use allocation as authorized in the [Plan].  The environmental assessments will determine whether specific projects 'may affect' threatened and endangered species. If the assessment shows a 'may affect' situation, exists, the [FWS] will be contacted for Formal [ESA] consultation."  *See also* BLM 670.  The Plaintiffs argue that because the November 9, 2005 memo from the BLM concedes that leasing "may affect" the hookless cactus, it was required by the terms of the Plan to engage in formal, rather than informal, consultation.

The Defendants respond that the language of the Plan refers to "specific projects," and argue that those "specific projects" are the individualized applications each lessee makes at the

25

APD stage.  The Plaintiffs appear to abandon this line of argument entirely in their reply, as they do not respond to the Defendants' contention.  Given that the Plan does not expressly or impliedly define the term "specific projects," and the Plaintiffs point the Court to no evidence that would cast doubt on the BLM's interpretation of its own phrase, the Court finds that the Plan requires formal consultation only if a "may affect" condition exists at the APD stage.

### b. Preparation of a BA

Next, the Plaintiffs argue that the BLM failed to prepare a required BA before engaging in consultation.  The ESA provides that, "with respect to any agency action," the agency "shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536(c)(1).  The Defendants argue that this provision relates only to a "major construction activity" within the meaning of NEPA.  *Citing* 50 C.F.R. § 402.12(b) ("The procedures of this section are required for Federal actions that are 'major construction activities'").  The Plaintiffs reply that, to the extent the regulations can be read as limiting the requirement of a BA to "major construction activities" instead of "any agency action," the regulation is inconsistent with the statutory requirement and thus, not entitled to deference.

As noted in the parties' briefs, the issue of the apparent inconsistency between the statute and the regulation has spawned a variety of judicial interpretations, many of which directly conflict.  This Court need not wade into that thicket, as it finds that, even if a BA was required, the BLM adequately conducted such an assessment as part of its September 2005 EA.  The ESA specifically acknowledges that a BA "may be undertaken as part of a Federal agency's compliance with [NEPA]." 16 U.S.C. § 1536(c)(2).  The ESA itself does not define what a BA must contain

– the only requirement is that it use the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2) – but the implementing regulations provide that the contents of a BA "are at the discretion of the federal agency and will depend on the nature of the Federal action." 50 C.F.R. § 402.12(f). The regulation suggests that certain things "may be considered for inclusion" in a BA, including the results of an on-site inspection of the area to determine if protected species are present; the views of experts on the species at issue; a review of applicable literature; an analysis of the effects of the action on the species and habitat; and an analysis of alternate actions considered by the agency. *Id.*

Here, the BLM's EA and informal consultation memo contain enough information to constitute a BA under the terms of the regulation. The memo to the FWS confirms that 9 nominated parcels contain instances of the hookless cactus, and further discusses the characteristics of the cactus' habitat. The EA contemplates the amount of land that each active well will affect, notes the direct and indirect environmental effects that result from development, and specifically contemplates alternatives and mitigation measures to protect threatened species such as the hookless cactus. The purpose of a BA is to "evaluate the potential effects of the action" on protected species and to "determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). NEPA's requirement of an EA serves almost precisely the same purpose – to determine "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9. Thus, because the BLM's EA addresses the same issues that a BA would, it suffices to meet the ESA's goals of ensuring that the BLM and FWS have sufficient information to permit them to assess the extent to which the BLM's decision will affect the hookless cactus.

Moreover, the Court is mindful that the regulations confer discretion to the BLM to decide what its BA should contain, and that such discretion is necessarily constrained by the nature of the action at issue. Here, because the decision to lease parcels for energy development occurs at a generalized level – at the leasing stage, it remains unclear whether any particular parcels will actually be developed, and even if they are, the nature and extent of any activities on those parcels is as yet unknown – the BLM is only able to assess the environmental consequences of that decision at a generalized level. Once a lessee comes forward with an APD specifying where and how development will occur, the BLM can assess the specific consequences of that proposal and impose precise restrictions to protect the affected cacti. Until that time, however, the BLM can only speak in somewhat generalized and speculative terms as to the types of restrictions that <u>might</u> be imposed. The Court is sympathetic to the Plaintiffs desire to know precisely what protective measures will ultimately be imposed by the BLM, but it is also understanding of the fact that, at this point in the process, the BLM does not yet know what the lessees will ultimately propose, and thus, can only list a variety of measures it <u>might</u> eventually implement

Accordingly, the Court finds that the combination of the BLM's September 2005 EA and November 9, 2005 memo to the FWS were sufficient to constitute a BA under the ESA.

c. <u>Sufficiency of evidence supporting the agencies' decision</u>

The Plaintiffs argue that the BLM and FWS's agreement that the resumption of leasing was not likely to adversely affect the hookless cactus was arbitrary and capricious because it was not supported by substantial evidence in the record. The argue that the BLM and FWS did not consider indirect effects of "future disturbances" that would result when development actually

began; because they did not consider the potential effects of the decision on parcels other than the 9 specifically identified as containing the cactus; and because the FWS's own cactus Recovery Plan warns of dire consequences for the cactus as a result of development activity.

With regard to the first argument – that the agencies failed to consider the effect that future development would have on the cactus – the Court disagrees. It is clear from the very outset that the BLM and FWS conferred with the understanding that the parcels that were to be leased would potentially be exploited for oil and gas development. The BLM's memo to the FWS recites a lease stipulation that advises lessees that they will have obligations "prior to undertaking any activity on the lease, including surveying and staking of well locations," as well as design restrictions that will apply to "drilling and producing operations." FWS 106. The memo also incorporates by reference the September 2005 EA that extensively discusses the BLM's expectations as to the scope and extent of development operations. Thus, the Court cannot say that the agencies' conferral failed to consider the effects that would result from future development on the leases.

The Court also rejects the Plaintiffs' argument that the FWS's own documents belie that agency's conclusion that development was not likely to adversely affect the cactus. The Plaintiff points to a "Unita Basin Hookless Cactus Recovery Plan," issued by the FWS in 1990. FWS 1-28. The Plaintiff emphasizes a passage in that document that states that oil and gas development "has the potential of devastating local populations" of the cactus through all phases of exploration and development. FWS 11. However, the Plaintiffs fail to note that the same report goes on to recommend that the cactus be protected through BLM permitting programs that "require[ ] an on-the-ground examination of all phases of oil and gas development which could impact" the cactus,

29

and "require[ ] oil and gas development activities to avoid individual cactus plants."  FWS 17.

The FWS notes that these protections "must continue to ensure the protection" of hookless cactus

populations.  *Id.*  If anything, the Recovery Plan acknowledges both that oil and gas development

might have adverse effects on hookless cactus populations, and that such adverse effects can be

mitigated by careful land use planning.  This is precisely what the agencies' ESA conferral

concluded.

Finally, the Plaintiffs contend that the agencies did not consider the effects that

development would have outside the "action area" – which the Plaintiffs argue should be defined

as all 16 parcels in the Ridge to be leased, not just the 9 parcels known to contain incidences of

hookless cactus.  It is clear from the record that the BLM only intended to consult with regard to

the 9 parcels known to contain hookless cactus specimens or habitat, and that the FWS'

concurrence was expressly limited to those 9 parcels.  The agencies are required to consider the

effects of the decision on the "action area," which is defined as "all areas to be affected directly

and indirectly by the Federal action and not merely the immediate area involved in the action."  50

C.F.R. § 402.02.  The BLM argues that it "rationally defined the action area as all parcels having

known hookless cactus or its habitat," but it is clear from the definition of "action area" that the

agencies must consider the effects that occur beyond "the immediate area involved in the action,"

*i.e.* those known to have incidences of hookless cactus.

The Plaintiffs make a persuasive point that development on other parcels might have

impacts that affect the hookless cactus in ways that development on the 9 parcels themselves

might not.  For example, the EA specifically notes that development of leases can result in

"negative impacts to air quality through fugitive dust emissions," BLM 1246, that development of

additional roads in the area could lead to increased public access, including unauthorized

collection of specimens and unauthorized surface disturbance, BLM 1247, and the Notice of

Lease Sale includes stipulations reflecting concerns about runoff resulting from development on

steep slopes, BLM 1809.  All of these are types of adverse effects that might spill over from

unchecked development on parcels not containing the cactus, and cause harm to the cactus on

parcels where development is more restricted.  Although the BLM believes that such

consequences are localized or can be adequately mitigated, it is not clear whether the FWS

agrees.  Accordingly, the Court finds that the agencies' conferral under the ESA was insufficient

to encompass all potential adverse effects resulting from development in the action area, and thus,

their concurrence that no further consultation was necessary was arbitrary and capricious.

 The Court cannot say that such error was harmless, as the FWS expressly declined to

extend its concurrence to encompass development on anything but the 9 cactus-bearing parcels.

Thus, the Court cannot find that, had the agencies conferred regarding the broader action area,

the result would necessarily have been the same.

 Under the Administrative Procedure Act, the Court shall "hold unlawful and set aside" any

agency action found to be arbitrary and capricious. 5 U.S.C. § 706.  Accordingly, the Court sets

aside the BLM and FWS's November 9 and 10, 2007 conferral under the ESA, and directs that

these agencies confer under the ESA with regard to the effects of the decision to resume leasing

on the entire action area.  Until sufficient conference takes place in accordance with the ESA, the

BLM is enjoined from taking any further action regarding or giving effect to any lease issued as a result of the September 2005 decision.[12]

>            d.  Reliance upon lease stipulations

The Plaintiffs' final argument is that the agencies' concurrence was arbitrary and capricious because the agencies improperly considered the effect that lease stipulations would have to mitigate any adverse effects.  The Plaintiffs argue that these stipulations are "discretionary, vague, and lack any specific trigger."  The Plaintiffs rely on cases such as *Center for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002), for the proposition that "[m]itigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."

As discussed previously, the Court finds that the degree to which the agencies can reasonably consider the mitigation effects of anticipatory lease stipulations is informed by the level of specificity of the project being assessed.  The Plaintiffs argue that "Agencies must identify the specific measures to compensate for known adverse impacts to listed species" (emphasis added), *citing Rumsfeld, supra*, but the key here is the word "known."  At the present time, there are no adverse impacts that the BLM and FWS know will affect the hookless cactus, because, at the lease issuance stage, it is unknown what parcels, if any, will actually be developed, nor how such

_____

[12]The Court will not simply void the September 2005 decision to resume leasing – and all of the BLM's subsequent acts implementing that decision – as doing so might adversely affect property interests obtained by lessees as a result of the lease sale.  It is possible that, after engaging in sufficient consultation regarding the entire action area, the agencies will again agree that the decision to resume leasing will not adversely affect the cactus.

development might affect the cactus.  Thus, at the time of the leasing decision, it was unknown

which lease stipulations, if any, will result in actual imposition of mitigation measures.  At best,

the BLM can only warn lessees that onerous restrictions could apply to their projects, if those

projects threaten to adversely affect the hookless cactus.  As the lessee's plans become more

specific – say, as set forth in an APD – the degree to which the BLM must specify its mitigation

measures rises as well.  However, at the general leasing stage of the project, the BLM is required

only to have a generalized conception of how it will protect the cactus.  Its reliance upon the

stipulations in the record to ensure that the hookless cactus is not adversely affected by

development is not arbitrary or capricious.

4.  Emergency listing of DeBeque Phacelia

The Plaintiffs' final ESA claim asserts that the FWS violated the ESA by failing to

"emergency list" the DeBeque phacelia in response to a citizen petition.

The record appears to suggest that, as of May 2004, the DeBeque phacelia was listed by

the FWS as a "warranted but precluded" species – that is, one that warranted ESA protection, but

which was not of sufficient priority to warrant immediate protective rulemaking.  In May 2004, an

organization called Center for Biodiversity petitioned the FWS to designate the phacelia as

threatened or endangered, citing the increase in energy development activities in the plant's

habitat.  *See* FWS 250.  In response, the FWS conducted a June 2004 Species Assessment,

determining that the phacelia should be upgraded from a priority 11 to a priority 8, but that no

emergency listing was warranted at the time.  In June 2005, Plaintiff Center for Native

Ecosystems again petitioned the FWS to list the phacelia as threatened or endangered.  FWS 162.

The FWS responded to that petition by referring back to its 2004 review and findings, and noted

that although the Center for Native Ecosystems had not requested emergency listing, the FWS nevertheless found that such listing was not necessary because the BLM was implementing "avoidance and mitigation measures" on development projects in the Phacelia's range.  FWS 250.

Under the ESA, the Secretary of the Interior has the discretion to "emergency list" a species in response to "any emergency posing a significant risk to that species."  16 U.S.C. §1533(a)(7).  Relaxed rulemaking and judicial review standards are imposed on regulations promulgated pursuant to an emergency listing, but such regulations are permitted to remain in place for a period of only 240 days.  *Id.*  The Plaintiffs' claims here arise under 16 U.S.C §1533(b)(3)(C)(iii), which provide that "The Secretary shall implement a system to monitor effectively the status of all [warranted but precluded species] and shall make prompt use of the [emergency listing] authority to prevent a significant risk to the well being of any such species."

The Defendants contend that because the Secretary's authority to emergency list a species is discretionary under § 1533(a)(7), it is beyond the scope of judicial review under the ESA's citizen suit provision.  16 U.S.C. § 1540(g)(1)(C) (ESA citizen suit permits an action "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty . . . which is not discretionary with the Secretary").  The Plaintiffs do not dispute this basic proposition, but contend that the use of the word "shall" in § 1533(b)(3)(C)(iii)'s requirement that the Secretary "shall make prompt use of" emergency listing authority for warranted but precluded species removes any discretion by the Secretary to choose not to act.  In response, the Defendants contend that although the ESA does compel the Secretary to exercise his or her discretionary power to act when "a significant risk to the well being" of a warranted by precluded species exists, the ESA does not define the "criteria or procedures" for making that determination, and

34

thus, it is still a discretionary decision immune from judicial review.  The Defendants go on to argue that the Secretary did indeed consider whether a significant risk to the well being of the DeBeque Phacelia was present in June 2004, and concluded that it was not.  FWS 317-324.

The Court does not understand the Defendants to dispute that if the Secretary had found a significant risk existed, the FWS would be compelled by § 1554(b)(3)(C)(iii) to emergency list the DeBeque phacelia.  Rather, the Defendants argue that the Secretary determined that no such risk exists, and thus, the Court need only consider whether that determination was arbitrary or capricious.  Having reviewed the Plaintiffs' briefs, the Court observes that the Plaintiffs do not contend that the Secretary failed to consider any material evidence in making its findings.  Rather, the Plaintiffs simply contend that, based on the facts as found by the FWS, the FWS should have concluded that a significant risk to the Phacelia's well-being existed.

The Court cannot say that the determination of no significant risk was arbitrary or capricious.  The FWS found that the phacelia's habitat coincides with high quality oil and gas reserves, and that exploration activities have been increasing in both number and density.  FWS 323. It noted that proximity to exploration activities rendered the phacelia vulnerable to soil disturbances and possible destruction of critical seed banks.  *Id.*  However, it also found that despite the rapid increase in threats, potential impacts to the species were not likely to destroy a significant portion of the species' habitat in the next two years.  The Plaintiffs do not point to evidence that suggests that this latter finding is unsubstantiated by the record or somehow inconsistent with the FWS's other findings; they simply assume that because the FWS recognizes that threats to the phacelia are increasing, a substantial risk to the species' well-being must presently exist.  Just as one can see clouds on the horizon without necessarily being currently

rained upon, there is nothing inherently arbitrary or capricious about the FWS observing that the threats to the phacelia are growing, but concluding that, at the present time, the species' well-being is not at substantial risk.  Notably, the FWS's findings are all phrased in general and predictive terms; the FWS does not purport to find that any specific development project is currently causing any of the cited adverse effects.  Moreover, the June 2005 decision notes that the BLM is implementing measures to protect the species, and the FWS was working with the BLM to develop additional conservation measures, actions which the FWS could reasonably believe would prevent the predicted harms from becoming a reality.

Based on the record and the parties' arguments, the Plaintiffs have failed to show that the FWS's conclusion in 2004 and 2005 that the DeBeque phacelia was not at significant risk to its well being was arbitrary or capricious.  Because such a finding is a necessary predicate to the Secretary's obligation to emergency list the species, the Plaintiffs have failed to show that the FWS violated the ESA in refusing such emergency listing.

### C.  NEPA claim

NEPA requires the Agency to take a "hard look" at the proposed action to determine what impact the proposed action will have on the human environment.  *See Citizens' Committee to Save Our Canyons v. United States Forest Service,* 297 F.3d 1012, 1021-22 (10th Cir. 2002); *Committee to Preserve Boomer Lake Park v. Dept. of Transp.,* 4 F.3d 1543, 1554 (10th Cir. 1993); 36 C.F.R. § 254.3(g).[13]  Typically, an agency begins this "hard look" by preparing an EA,

---

[13] NEPA has two primary goals: (1) to force the government to take a "hard look" at the environmental impacts of proposed actions; and (2) to require the government to inform the public of such impacts and explain how the government's decisions address environmental impacts.  *Citizens' Committee to Save Our Canyons,* 297 F.3d at 1021-22.

and on the basis of that EA, determines whether a more detailed Environmental Impact Statement ("EIS") is required. *See Committee to Preserve Boomer Lake Park v. Dept. of Transp.,* 4 F.3d 1543, 1554 (10th Cir. 1993); 40 C.F.R. § 1501.4(c).

An EIS is required for federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also Colorado Wild v. United States Forest Service,* 435 F.3d 1204, 1209 (10th Cir. 2006). A federal action "affects" the environment when it "will or <u>may</u> have an effect" on the environment. 40 C.F.R. § 1508.3 (emphasis added). Thus, an EIS is required if the agency finds that the proposed action may have a significant impact on the human environment. *See Utah Environmental Congress,* 443 F.3d at 736. However, if the agency concludes, based upon the EA, that there will be no significant impact, it may issue a FONSI[14] without preparing an EIS. *Citizens' Committee to Save Our Canyons,* 297 F.3d at 1022; 40 C.F.R. §§ 1508.13 & 1501.4(e). In this case, the BLM determined, based on its EA, that a FONSI rather than an EIS was appropriate.

The Plaintiffs contend that the BLM violated NEPA in two respects: (i) by failing to adequately consider available alternatives to the proposed action of reopening the South Shale

---

[14] A Finding of No Significant Impact briefly explains why the proposed action will not have a significant effect on the human environment. It must include a summary of, or incorporate, the EA, and must refer to any related environmental documents. 40 C.F.R. §1508.13.

Ridge to oil and gas exploration; and (ii) that its FONSI was not supported by substantial evidence in the record.

Turning to the first argument, the Plaintiffs contend that although the EA purported to consider a "no action" alternative of not engaging in leasing, the BLM had already administratively rejected the notion of continuing the deferral of leasing, and thus, the BLM was unable to implement the "no action" alternative regardless of the outcome of the EA. In addition, the Plaintiffs contend that the BLM dropped the "no surface occupancy" alternative discussed in earlier drafts of the EA without explanation, and that evidence of internal deliberations within the BLM show that no justification existed for the BLM's purported belief that such a restriction was economically infeasible. The Plaintiffs also contend that the EA did not consider the alternative of designating the entire area as a WSA.

Consideration of reasonable alternatives is "the heart" of the NEPA process. *Lee v. U.S. Air Force*, 354 F.3d 1229, 1238 (10th Cir. 2004), *citing* 40 C.F.R. § 1502.14. By considering reasonable alternatives to the proposed action, the agency ensures that it has considered all possible approaches to, and potential environmental impacts of, a particular project; as a result, NEPA ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Northern Alaska Env. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006), *citing Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). Under NEPA, "an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Id.* An agency need not, therefore, discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy

objectives for the management of the area." *Id.*; *Lee,* 354 F.3d at 1238.  NEPA does not require

BLM to explicitly consider every possible alternative to a proposed action.  *Westlands Water*

*District v. United States Department of the Interior*, 376 F.3d 853, 871 (9th Cir. 2004).  An

agency must, however, explain its reasoning for eliminating an alternative.  See 40 CFR

§1502.14(a); *Kempthorne*, 457 F.3d at 978.

        1. The "no action" alternative

      The Court rejects the Plaintiffs' initial argument – that the "no action" alternative was not

feasible because the *status quo* had already commanded that leasing resume – for the reasons

stated *supra*.  The Plaintiffs cite several portions of the record in support of a contention that "in

2003, BLM revoked its policy of deferring oil and gas leasing," but none of the cited documents

actually stands for that proposition.[15]  The Plaintiffs also cite to a comment from Joe Stout,

apparently a BLM employee, in response to the July 2004 draft EA.  BLM 1081-89.  Stout's

comment suggests that the description of the "no action" alternative be changed from

"continuation of current management" to "no leasing," insofar as he believed that "[w]e cannot

keep deferring the leasing parcels from the lease sale because of Bureau policy."  BLM 1085.

However, there is no indication in the record that Stout was interpreting the policy correctly, or

---

[15]BLM 984-85 is an October 2003 memo from the BLM Colorado State Director to Field
Office Managers.  Among other things, it purports to rescind certain "IMs" that are not found in
the record.  By their titles, none of these IMs appear to deal directly with deferral of future
leasing.  BLM 971-73 is a September 2004 memo from the BLM Director to State Directors,
discussing the effect of the Utah Settlement, but says nothing that, directly or indirectly, suggests
that the BLM Colorado State Office could not continue deferring leasing.  BLM 974-79 is a
September 2003 memo from the BLM's Assistant Director for Renewable Resources and
Planning to State Directors regarding "consideration of wilderness characteristics in the land use
planning process" in light of the Utah Settlement.  It, too, says nothing that, directly or indirectly,
suggests that the Colorado State Office could no longer defer leasing.

that the BLM itself shared Stout's view.   If anything, the record suggests the opposite; the

September 2005 EA specifically states that if the "no action" alternative were adopted, "all leasing

in South Shale Ridge would be deferred."   BLM 1243.   The Plaintiffs appear to suggest that,

despite outward appearances, the BLM did not believe it had the authority to continue deferring

leases, but other than a single comment by an employee whose ability to make binding statements

of agency policy is not established, nothing in the record supports that assertion.

The crux of the Plaintiffs' argument on this issue seems to be that because the BLM

believed that the Utah Settlement prevented it from designating the South Shale Ridge as a WSA,

the "no action" alternative was a sham.   Such an argument necessarily assumes the premise that

WSA designation is the only conceivable outcome of adopting the "no action" alternative.

However, the record indicates that this premise is false.   The same memos that discuss how the

Utah Settlement prevents future WSA designations expressly state that the BLM can "accord

special management protection for special values through the land use planning process," such as

the revision or amendment of Resource Management Plans.   BLM 972.   Moreover, the memos

acknowledge that during the planning process, the BLM cannot impose the strict non-impairment

standards that would apply if the land were being considered as a WSA, but can "manage [the

land] using special protections to protect wilderness characteristics."   BLM 973.   This is entirely

consistent with the "no action" alternative contemplated by the BLM in the EA – although it

would not amount to a WSA designation, the "no action" alternative would preserve whatever

wilderness characteristics existed in the land by continuing to defer leasing until the agency could

revise or amend the 1987 Resource Management Plan to completely prohibit oil and gas

exploration in the region.  Thus, the Court rejects the Plaintiffs' argument that the "no action" alternative was somehow invalid.

2. The "no surface occupancy" alternative

The demise of the "no surface occupancy" alternative is more troubling, however.  The July 2004 draft EA contemplated a "no surface occupancy" alternative that would "prevent physical placement of surface facilities and any related surface disturbance" on newly-issued leases.  BLM 1052.  The July 2004 draft EA notes that "The new ["no surface occupancy"] acreage would eliminate 17 of the 21 wells projected to be drilled under the proposed action . . . Because directional drilling is not considered economic, none of the gas reserves would be recovered in the ["no surface occupancy"] area."  BLM 1070.   In an August 6, 2004 comment on the July 2004 draft EA, a BLM employee observed that "More discussion is needed on why directional drilling isn't economically feasible.  There isn't any data to support this statement.  This is important so the ["no surface occupancy"] impacts can be quantified."  BLM 1098.  In an undated memo from the Deputy State Director of the BLM's Colorado State Office, apparently commenting on the July 2004 draft EA, the author states:

> The ["no surface occupancy"] Alternative . . . is based upon the assumption that directional drilling is not technically or economically feasible (taken from the OGPR prepared for the purpose fo the EA).  If directional drilling is not technically or economically feasible, and there is no other way to get at the oil and gas resources, how is it a viable leasing alternative, let alone a reasonable alternative?
>
> [. . . ]
>
> Thus, the ["no surface occupancy"] alternative should be thrown out because it is not a reasonable alternative.

BLM 1101.

The "OGPR" that this commentator refers to appears to be a report entitled "Oil and Gas

Potential and Projected Oil and Gas Activity" Report, prepared by the BLM on July 6, 2004.

SUP 422.  However, contrary to the commentator's statement, the OGPR does <u>not</u> state that

directional drilling is "not technically or economically feasible."  Rather, the OGPR states

"Conventional drilling practices have been incorporated in the [South Shale Ridge]. . . Due to the

marginal economies of the [Regional Study Area[16]], directional drilling of the higher producing

horizons <u>has not been attempted</u> by the current Operators."  SUP 432 (emphasis added).

The record does not reveal any further discussion within the BLM with regard to the "no

surface occupancy" alternative.  In April 2005, the BLM issued another draft EA, this time

omitting the "no surface occupancy" alternative without comment.[17]  The final EA in September

2005 EA makes a passing reference to the "no surface occupancy" alternative from July 2004,

noting that "Based on guidance received from the BLM Colorado State Office, the [July 2004]

draft EA was revised and re-released in April 2005 in its current version."  BLM 1243.

---

[16]The Regional Study Area is an area more than 180,000 acres in size that includes the South Shale Ridge and 8 surrounding townships. SUP 429.  Of the 261 oil and gas wells in the Regional Study Area, only 13 are located within the South Shale Ridge.  The vast majority of wells – 154 in total – are located southeast of the Ridge, in an area known as Shire Gulch.  *Id.*

[17]The April 2005 draft EA refers to the July 2004 draft EA, and notes that the prior draft considered a "no surface occupancy" alternative.  BLM 1156.  It goes on to state that "The No-Action Alternative was considered but not carried forward."  *Id.*  Because there is indeed a "no action" alternative discussed in this EA, the Court assumes this to be a typographical error, and that it was the "no surface occupancy" alternative that was considered but not carried forward. Nevertheless, it gives no explanation whatsoever as to the reasons why the "no surface occupancy" alternative was not carried forward.

The Court finds that the BLM's rejection of the "no surface occupancy" alternative violated NEPA in both a technical and substantive sense.  The Court finds that final September 2005 EA does not adequately explain why the "no surface occupancy" alternative was dropped. 40 C.F.R. § 1502.14(a) requires that the EA "briefly discuss the reasons" why an alternative was eliminated.  At best, the September 2005 EA only notes that the "no surface occupancy" alternative was eliminated "[b]ased on guidance received from the BLM Colorado State Office," but this is inadequate to constitute a "discuss[ion]" of the "reasons" for eliminating that alternative; it is a statement as to who provided the reasons for the elimination, but not a statement of the reasons themselves.

Moreover, even if the BLM had fully articulated the reasons for excluding the "no surface occupancy" alternative, the Court would nevertheless find that, on the present record, the decision to eliminate that alternative was arbitrary and capricious.  No evidence in the record supports the Colorado State Office's "assumption" that directional drilling was technically and economically infeasible.  The Colorado State Office appears to have developed this assumption solely from the OGPR, but the OGPR itself does not make such an assertion.  Rather, the OGPR simply states that directional drilling "has not been attempted by the current Operators."  Although it may very well be true that directional drilling is not actually feasible due to characteristics of the South Shale Ridge, the mere assertion that current lessees have not attempted such drilling is insufficient

evidence to establish that fact.[18]  Accordingly, the Court finds that the September 2005 EA

violated NEPA, in that it did not adequately consider the "no surface occupancy" alternative.

The Court cannot say that the failure to consider a "no surface occupancy" alternative was

harmless.  Given its plausibility (at least on the instant record), and its mix of energy development

and conservation characteristics, the "no surface occupancy" alternative presented a potentially

appealing middle-ground compromise between the absolutism of the outright leasing and no

action alternatives.  The Court cannot say that, had the BLM considered a "no surface

occupancy" alternative to conclusion as part of its analysis, it would not have selected that course

of action.  Thus, the unexplained omission of the "no surface occupancy" rendered the EA

arbitrary and capricious.  Because the EA violated NEPA, the Court sets it aside under 5 U.S.C. §

706.  By extension, the FONSI, which assesses the environmental impact of the action chosen by

the EA, is necessarily set aside as well.  Until it fully complies with NEPA, the BLM is enjoined

from taking any further action regarding or giving effect to any lease issued as a result of the

September 2005 decision, subject to the discussion *supra.* at n. 12.  Because the Court sets aside

the EA and FONSI, it need not reach the remaining arguments as to the insufficiency of those

---

[18]Williams' brief argues that "simple geometry" shows that a "no surface occupancy" restriction on the entire South Shale Ridge would restrict the reach of directionally-drilled wells to "perhaps one-half mile inside the area, making exploration and production impossible."  Putting aside the fact that this argument has no connection to the actual Administrative record, the Court notes that a map showing abandoned and currently-producing wells in the portion of the Ridge deemed to have wilderness character reveals that the vast majority of those wells are located less than one-half mile from the boundaries of the parcel.  SUP 421.   The Court also notes that, at oral argument, Williams' counsel stated that it was "<u>at the APD level</u> when they can get on the site, they can see what's going on, they can see if it makes sense, <u>does it make sense to do directional drilling here</u>, does it not make sense to do that?" (Emphasis added.)

documents. This also moots the Plaintiffs' arguments that the decision to resume leasing violated

FLPMA because it was inconsistent with the 1987 Plan.[19]

**CONCLUSION**

For the foregoing reasons, Williams' Renewed Motion to Intervene **(# 40)** is **GRANTED**,

and Williams shall be permitted to intervene in this action pursuant to Fed. R. Civ. P. 24(b).  The

Plaintiffs' Unopposed Motion to Seal **(# 41)** certain exhibits in support of the Plaintiffs' Motion to

Supplement the Administrative Record is **DENIED**, but because the Court has not considered the

documents at issue in reaching its substantive determination on any of the issues in this case, the

documents at Docket # 42 shall remain under seal.  The Plaintiffs' Motion to Supplement the

Administrative Record **(# 43**, as supplemented **# 54)** is **GRANTED IN PART** and **DENIED IN**

**PART** as set forth herein.  The Plaintiffs' Unopposed Motion for Leave to File the Administrative

Record Conventionally **(# 59)** is **GRANTED**.  The Plaintiffs' Unopposed Motion for Leave to

File an Overlength Brief **(# 75)** is **GRANTED**.

The Plaintiffs' Motion for Review of Agency Action **(# 61)** is **GRANTED** in so far as the

Agency Action has been reviewed.  The Court sets aside, as arbitrary and capricious, the BLM

and FWS's concurrence that the decision to resume leasing will not adversely affect the hookless

cactus, and the BLM's EA and FONSI.  The Defendants shall take no further action with regard

---

[19]Although the Court makes no specific findings, based on its review of the record and the parties' arguments, it expresses its concern as to inaccuracies in the EA and FONSI regarding the degree to which the South Shale Ridge retains its natural character and the presence of man-made features within its boundaries.  The Court also has concerns that the lack of lease stipulations explicitly permitting "no surface occupancy" restrictions to protect "sensitive plant species" such as the DeBeque phacelia and milkvetch, might violate the apparent requirements of the 1987 Plan that such species be protected by "no surface occupancy" stipulations.

45

to the September 2005 decision to resume leasing or with regard to the leases issued in November 2005 until and unless they have fully complied with the ESA and NEPA, as discussed herein.

Dated this 6th day of August, 2007

BY THE COURT:

Marcia S. Krieger
United States District Judge